**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**AUGUSTA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 1:20-CR-00063-BKE-DHB-1 |
| v. | ) | |
| | ) | |
| SHERLEY L. BEAUFILS | ) | |

**SENTENCING MEMORANDUM**

Ms. SHERLEY L. BEAUFILS, pursuant to Fed. R. Crim. P. 32(i)(1)(C), respectfully submits the following information and argument for this Court's consideration at sentencing, and pursuant to S.D. Ga. L. Civ. R. 7.1(a), respectfully moves this Court to allow this memorandum to exceed that rule's prescribed twenty-six-page limit by eight pages, based on her need to present the substantial volume of information and argument fully.

**I.    Introduction**

Ms. Beaufils admits to being involved in the offense from March 2018 until April 2019. Ms. Beaufils did not question the claims the government made about the conspiracy or the statutes violated at her trial. Ms. Beaufils decided to proceed to trial because she firmly believed that she did not have the intent to defraud the United States; that she did not have the intent to steal anyone's identity; and that she did not intend to bilk any government health program of much-needed funds. As she testified at trial, she believed that she told the Federal Bureau of Investigation ("FBI") agent the truth, but the responses he recorded did not comport with her intended responses. Ms. Beaufils takes full responsibility for this. Ms. Beaufils, as conceded in the Presentence

1

Investigation Report ("PSR") at ¶ 17, was not involved with those individuals named as co-conspirators who obtained identities of elderly patients and who set up call centers, nor was she involved in selling durable medical equipment ("DME") or recruiting physicians. Ms. Beaufils admits that she was solicited as stated in ¶ 19, but that she was unaware that she was signing false medical records or certifying tests that were never performed.

Ms. Beaufils is a second-generation immigrant; she is a naturalized citizen; and she is grateful for the opportunities the United States has given to her and her family. She is a good and decent person who had no need to defraud the government to earn an additional $36,270.00.

## II.    Mandatory Term of Imprisonment for Aggravated Identity Theft (18 U.S.C. § 1028A(a)(1))

The mandatory two-year term of imprisonment for Ms. Beaufils's convictions on Counts Thirteen through Seventeen of the Superseding Indictment can be avoided, and Ms. Beaufils respectfully urges the Government and this Court to allow it. First, the Government can consider Ms. Beaufils to have provided substantial cooperation in the investigation or prosecution of another individual, pursuant to 18 U.S.C. § 3553(e) and U.S.S.G. § 5K1.1, which she believes that she did in her interview with the FBI agent at her home, during which she disclosed information of which the Government previously was unaware. Second, if the Government agrees that Ms. Beaufils's cooperation is substantial, it may recommend to this Court that it impose a sentence of less than the mandatory term of imprisonment, and this Court, not being bound by that term, may accept the Government's recommendation. The justification for a sentence of less than

18 U.S.C. § 1028A(a)(1)'s mandatory minimum penalty exists pursuant to the factors prescribed in 18 U.S.C. § 3553(a), in addition to the the justification and authority that this Court would have pursuant to 18 U.S.C. § 3553(e) and U.S.S.G. § 5K1.1—Ms. Beaufils admitted her role in the case, which she believes that she did when testified at trial: she said exactly what she did, only disagreeing with the claim that she *knowingly* committed the charged crimes. The masterminds of the offense served no prison time. *See infra*.

III.    **Factual Assertions**

a.    **Narrative**

Ms. Beaufils received a call in early-2018 from Ms. Julixa Crim, who worked for Royal Physician Network ("RPN"), a telemedicine company, and Envision-It-Perfect ("EIP"), a medical billing company, both owned by Ms. Charlene Frame. After providing Ms. Beaufils with information about the companies, Ms. Crim stated she had three options for which Ms. Beaufils would qualify to work with RPN and EIP as a Nurse Practitioner ("NP"): (1) perform chart reviews (proofread for grammar, punctuation, the orders' being consistent with the diagnosis) for $25.00 per completed chart uploaded to the DME platform, DMERx, which Ms. Beaufils accepted; (2) transcribe the DMERx prescription portal audible encounters with patients for $30.00 per chart, which Ms. Beaufils declined; or (3) perform her own patient visits and bill Medicare accordingly, since her then-business, Beaufils Consulting Group, LLC, had its own National Provider Identifier ("NPI") and was credentialed by Medicare to conduct and bill for such encounters (*see* Ex. 88–90), which Ms. Beaufils also declined.

The State of Georgia is a collaborative state pursuant to Medicare rules, which

means that an NP cannot be a sole provider or clinician; an NP functions only as an extension of a physician. Therefore, Ms. Beaufils understood that while working with RPN pursuant to the first or second aforementioned options, RPN's physicians had completed the patient consultations and examinations, evidenced by the date of those consultations and examinations, and the respective physicians' names for whom Ms. Beaufils reviewed the patients' charts, in DMERx.

Ms. Beaufils began reviewing patient charts for RPN, and in April 2019, she received a call from a Cigna insurance company representative who requested information concerning a beneficiary for whom DME was ordered. Ms. Beaufils asked the representative for the name of the physician who approved the order, and the representative advised that no physician had approved the order—only Ms. Beaufils's name appeared on it. Ms. Beaufils confronted RPN about the inquiry; Ms. Frame and RPN's manager assured Ms. Beaufils that her name was not the only one on the order, and that they would investigate the issue and resolve it. Ms. Beaufils consistently saw a physician's name on the orders in DMERx (*see* Ex. 99), and believed that RPN and she were in compliance with the rules for a collaborative state. RPN's eventual response was that one of its vendors was not following the proper protocol, and it had Ms. Beaufils not review charts for the vendor until RPN resolved the issue.

Ms. Beaufils ultimately resigned from any association with RPN because of the inconsistencies in it response to her inquiry concerning the aforementioned Cigna beneficiary and its apparent inability (or unwillingness) to resolve the issue of Ms. Beaufils's name's being used on documents that required, additionally, that of a

physician. RPN referenced doctors, nurses, and physician's assistants ("PAs") in correspondence with Mr. Beaufils. (*See* Ex. 102.)

After Ms. Beaufils's terminating her association with RPN, it advised its professional associates that it was not involved in health care fraud (*see* Ex. 23), but Ms. Beaufils elected not to have any further association with RPN.

In July 2018, and FBI agent went to Ms. Beaufils's home and advised her that the FBI believed that her NPI had been compromised. Ms. Beaufils agree to discuss the matter with the agent and advised him of the aforementioned issue with Cigna. Ms. Beaufils assumed that the agent was aware of her association with RPN, but he was not —she advised him of that association and the role that RPN took, according to her belief, of compromising her NPI. The agent served Ms. Beaufils with a "target letter" only at the end of the conversation.

### b.    Documents Not Presented at Trial

Ms. Beaufils, pursuant to 18 U.S.C. § 3661, submits the following information in support of her testimony and sentencing position that she did not introduce at trial:

Ex. 1 and 2 are a Detailed Written Order for Orthosis as seen by Ms. Beaufils on the DMERx platform. It contains a detailed physician's note with an objective physician's evaluation and diagnosis. The Common Procedure Terminology ("CPT") code (IDC10), the diagnostic code used for billing, was included here already. Also, the detailed device description noted shows that RPN had selected the DME company already.

Ex. 3 is a list of three companies where Sherley has reassigned benefits through a power of attorney; RPN is not listed.

Ex. 4 demonstrates that RPN never requested Ms. Beaufils to complete consultations or examinations; RPN's physicians (to her knowledge) had completed them already. Incidentally, Ms. Beaufils had the ability to conduct consultations and examination with her own physician oversight, for which she would have earned substantially more money for her services; her understanding of her role at RPN simply was to review charts as previously mentioned.

Ex. 5 demonstrates that an NP receives eighty percent reimbursement for a consultation according to the Centers for Medicare and Medicaid Services ("CMS"), and a physician receives 100 percent reimbursement for a consultation. It was in RPN's best interest to deceive an NP that a chart review was the only task necessary; otherwise, the NP would have required substantial more compensation for that service.

Ex. 6 demonstrates that these records would not have been maintained in the Wellstar system.

Ex. 7, a Sprint call log, shows no patient contact because the consultations and examinations (to Ms. Beaufils's knowledge) had been completed by RPN's physicians; there was no need for her to contact patients after the completion of those consultations and examinations—if there were any discrepancies in the charts, Ms. Beaufils simply would not attest to their accuracy.

Ex. 8 demonstrates that if Ms. Beaufils had completed the patient consultations or examinations, she would have had the authority to bill and received reimbursements directly from the health care benefit program; her association with RPN would have been unnecessary.

Ex. 9 demonstrates that the pronoun "I" refers to the physician, not the NP.

Ex. 10 evidences Ms. Beaufils's communications with EIP in which she corrects EIP's reference to her as a physician, and EIP responds that "going forward your charts will be corrected."

Ex. 11 demonstrates Ms. Beaufils's declining additional employment that requires reviewing recordings of patient consultations and entering that information into DMERx.

Ex. 12 and 13 show the only companies for which Ms. Beaufils has the authority to conduct consultations and receive reimbursement; RPN is not one of them. Ex. 13 further shows that there was no request by RPN for Ms. Beaufils to complete a consultation.

Ex. 14–18 are examples of how the chart attestation, the post-review, the order to complete consultation, the credentials application, and the request were supposed to appear.

Ex. 19 shows the already-completed consultations with date of the consultation, which happened two days before RPN requested Ms. Beaufils's review.

Ex. 20 shows an examination completed and entered into DMERx by RPN.  Ms. Beaufils requested completion before she reviewed the chart.

Ex. 21 shows attached physician notes embedded with the order.

Ex. 22 shows the relevant Code of Federal Regulations; RPN was aware that Ms. Beaufils was an NP and not a physician.

Ex. 23 is a communication from RPN to Ms. Beaufils after she terminated her association with RPN, asserting that RPN is not a part of a health care fraud scheme.

Ex. 24 and 27 evidence that Ms. Beaufils worked as a registered nurse, not an NP,

for Core Medical. The PSR incorrectly states that Ms. Beaufils worked for ten weeks as an NP rather than as an RN. She had a decrease in hours in the emergency room because of the declining census resulting from COVID-19. These exhibits include an Envision Physician Services letter implementing modifications in Ms. Beaufils's hours and pay, and Ms. Beaufils's IRS Form W-2 showing that she worked at Georgia State University in 2021, among other employment.

Ex. 28–30 show Patient P.W.'s exam and chart-review dates are different, and that there was no request for a consultation. Ex. 29 shows that which Ms. Beaufils observed on the DMERx platform—she confirmed that the examination and the treatment plan matched the order being prescribed. The physician's information was visible to Ms. Beaufils on the platform, thereby causing her to believe that the physician had completed the consultation and order.

Ex. 31 is evidence of Ms. Beaufils's business NPI for consultation reimbursement with physician oversight.

Ex. 32–34 shows the revocation of Ms. Beaufils's Medicare privileges on February 16, 2022.

Ex. 82–84  are emails dated April 9, 2019, between Ms. Beaufils RPN's administrative assistant in which Ms. Beaufils refused to provide her Drug Enforcement Administration identifier, and only her NPI, which is that which she utilized to prescribe non-narcotics.

Ex. 85–87 are emails dated February 1, 2019, between Ms. Beaufils and EIP which demonstrate that Ms. Beaufils was not comfortable stating that she consulted with a patient when she did not; EIP responds that it will change its process regarding future

patients.

## IV.    Presentence Investigation Report

### a.    Intended Loss (¶ 37)

Ms. Beaufils had no intent for there to be a fraudulent loss to any health care benefit program. Although Ms. Beaufils does not deny her role in this case, her position since the day she was questioned by the FBI agent has been that she was reviewing charts for quality control; that her Medicare billing number was required by those who initiated the conspiracy; and that it was not her intention for her NPI to be billed for visits, consultations, prescriptions or any medical service. It was her intention to review charts and to be paid $25.00 for each chart reviewed, which, if the chart appeared to be legitimate, DME was approved. Ms. Beaufils intention was to be paid that fee per chart review and she earned $3,270.00.

### b.    Obstruction of Justice (¶ 42)

In support of Ms. Beaufils's objection to ¶ 42 of the PSR, the following cases are examples of those in which the Eleventh Circuit has found that an adjustment for obstruction of justice was not warranted:

In *United States v. Guevara*, 894 F.3d 1301 (11th Cir. 2018), the defendant, who was convicted of causing a car dealership to submit Form 8300s with the United States Treasury Department that contained material omissions and misstatements regarding his identity as the purchaser of three cars with cash payments of over $10,000, appealed his convictions and sentence. *Id*. at 1304. The Eleventh Circuit found the U.S.S.G. § 3C1.1 obstruction of justice adjustment was not warranted on grounds that the sentencing court failed to make specific findings as to the conduct that amounted to

obstruction of justice. *Id*. at 1312–1313.  The court "made nothing more than vague, equivocal statements regarding [defendant's] tax returns, use of a straw buyer to commit the crime with which he was charged, and initial misstatements to agents during the interview outside of his home." *Id*. at 1312. The court's decision "seem[ed] to hinge on defendant's handling of his tax returns, many of which were filed several years before the offense conduct took place." *Id*.

In *United States v. Lawrence*, 972 F.2d 1580 (11th Cir. 1992), the Eleventh Circuit vacated an obstruction enhancement remanded the case for resentencing, because the sentencing judge failed to independently find that defendant willfully lied at trial. *Id*. at 1581. The sentencing court imposed the enhancement "because it thought that the jury verdict established conclusively that the defendant had lied." *Id*. at 1582. The Eleventh Circuit emphasized that "the sentencing court must make its own decision, informed but not dictated by the jury's verdict." *Id*. at 1583.

In *United States v. Shriver*, 967 F.2d 572 (11th Cir. 1992), the Eleventh Circuit found the obstruction of justice enhancement was inappropriate where the defendant's false statement to an IRS inspector was not under oath and where no evidence showed such false statements significantly obstructed or impeded the official investigation. *Id*. at 575. Application Note 4 to § 3C1.1 clarifies that simply "making false statements, not under oath, to law enforcement officers" warrants no application of the sentence increase. *Id*., quoting Application Note 4 to U.S.S.G. § 3C1.1. Moreover, the government failed to meet its burden of proving the applicability of the enhancement because it failed to refute the defendant's claim that the IRS Inspector was never deceived. *Id*. at 575.

In *United States v. Stubbs*, 944 F.2d 828 (11th Cir. 1991), the Eleventh Circuit

affirmed the sentencing court's refusal to adjust a drug conspirator's sentence upward for obstruction of justice on ground that the conspirator perjured herself, even though government pointed out apparent contradictions in her trial testimony. *Id*. at 836.

In *United States v. McDonald*, 935 F.2d 1212 (11th Cir. 1991), the Eleventh Circuit deferred to the sentencing court's decision not to impose an upward adjustment for obstruction of justice, although portions of the defendant's testimony were severely compromised by the testimony of more credible witnesses. *Id*. at 1219. The Eleventh Circuit reasoned that "[t]he district court is uniquely suited to make such a determination because it heard all the evidence and was able to observe a particular witness' demeanor and behavior on the witness stand." *Id*.

## V.    18 U.S.C. Section 3553(a) Factors

The Court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)," which are "the need for the sentence imposed—

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

18 U.S.C. § 3553(a)(2). In "determining the particular sentence to be imposed," the Court must consider these purposes, the nature and circumstances of the offense and the history and characteristics of the defendant, the need to avoid unwarranted disparities, and the need to provide restitution to any victims of the offense. *See* 18 U.S.C. §3553(a) (1)–(7).

"While the fraud guideline focuses primarily on aggregate monetary loss and victimization, it fails to measure a host of other factors that may be important, and may be a basis for mitigating punishment, in a particular case." Allan Ellis, John R. Steer, Mark Allenbaugh, *At a "Loss" for Justice: Federal Sentencing for Economic Offenses*, 25 Crim. Just. 34, 37 (2011); see also *United States v. Ovid*, slip op., 2010 WL 3940724, *1 (E.D.N.Y. Oct. 1, 2010) ("[T]he fraud guideline, despite its excessive complexity, still does not account for many of the myriad factors that are properly considered in fashioning just sentences, and indeed no workable guideline could ever do so.").

A substantial variance is needed in this case because of the following mitigating factors, all of which are highly relevant to the purposes of sentencing and none of which is taken into account by the guidelines range.

### a. Need for Just Punishment in Light of the Seriousness of the Offense

The need for retribution is measured by the degree of "blameworthiness," which "is generally assessed according to two kinds of elements: the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his degree of intent (mens rea), motives, role in the offense, and mental illness or other diminished capacity." Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment*: "Proportionality" Relative to What? , 89 Minn. L. Rev. 571, 590 (February 2005). The guidelines include none of the factors bearing on Ms. Beaufils's degree of culpability.

Ms. Beaufils was not motivated by greed and she has presented a bank check to the Court for the money she made from the offense. A defendant's motive is highly relevant at sentencing. *See e.g., Wisconsin v. Mitchell*, 508 U.S. 476, 485 (1993); *United*

*States v. Mahan*, 2007 WL 1430288, at *3 (10th Cir. 2007) (sentence was procedurally unreasonable where district court refused to consider defendant's stated motive for possessing unloaded shotgun, i.e., that he had been violently beaten by three men and sought to defend his wife); *United States v. Milne*, 384 F. Supp. 2d 1309, 1310–11 (E.D. Wis. 2005) (granting variance where "defendant did not take the bank's money out of greed or a desire to live a lavish lifestyle, [but in effort] to keep a sinking business afloat"); *United States v. Ranum,* 353 F. Supp. 2d 984, 990 (E.D. Wis. 2005) (defendant did "not act for personal gain or for improper personal gain of another").

This Court should consider Ms. Beaufils's loss of profession and reputation. *See e.g., United States v. Gaind,* 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (granting downward departure where defendant was punished by the loss of his business); *United States v. Vigil*, 476 F. Supp. 2d 1231, 1235 (D.N.M. 2007) (finding variance appropriate where defendant was collaterally punished by loss of his position and reputation, widespread media coverage, and emotional toll of two lengthy public trials); *United States v. Samaras*, 390 F. Supp. 2d 805, 809 (E.D. Wis. 2005) (granting variance in part because defendant lost a good public sector job as a result of his conviction). *See* Exhibits and letters setting out Section 3553 factors in great detail.

### b. Need for Deterrence

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id.*; *see also* Zvi D.

Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime,* 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("certainty of punishment is empirically known to be a far better deterrent than its severity").

Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University. *See* Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999), summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries. *Id*. at 1. It examines the effects of changes to both the certainty and severity of punishment. *Id*. While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance." *Id*. at 2. The report concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id*. at 1.

Research regarding "white-collar" offenders in particular (presumably the most rational of potential offenders) found no difference in the deterrent effect of probation and that of imprisonment. *See* David Weisburg et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995); *see also* Gabbay, *supra*, at 448-49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."). According to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

### c. Characteristics of the Defendant

#### 1) <u>Letters of Support</u>

There are thirty-six pages containing letters of support. The letters are from the following individuals and institutions:

### • Rev. Dr. Jean Beaufils, Ms. Beaufils' husband - Ex. 35

Rev. Dr. Jean Beaufils met Ms. Beaufils in 1999 and have been married for over 18 years, with three beautiful daughters. Rev. Dr. Beaufils is also a licensed counselor and he is employed by a counseling service of licensed professionals.  He wrote that

> Your honor, Sherley is the hardest working wife and mother I know. She works hard for everything she has including accomplishing her desire to practice medicine, a childhood dream. I have watched Sherley transform the lives of dozens of young men and women in Pennsylvania and in Georgia providing them with spiritual, social, educational and financial help. Her life has been a tool for God to advance His kingdom. Ever since Agent Dye knocked on our door 3 years ago, our lives have been turned upside down. My wife has been called s liar, a cheat, and a criminal for the first time in her life. I am not sure why God allowed this evil to happen to His daughter, but I know that Sherley's faith in God is being tested for greater purposes that we cannot see or understand right now. My wife believes in the absolute truth of Scriptures and was determined not to shame her God for a lighter sentence. I know that God has the last word in all of this. He ordered the steps of His children, and God will work everything together for Sherley's good.

### • Patrice Aime, CT mail carrier - Ex. 36

Patrice Aime wrote that Ms. Beaufils and her husband have been close with for over twenty years. Patrice Aime speaks of Ms. Beaufils' faith, her role as the wife of a minister, her devotion as a mother and to her integrity and character.

### • Natalie Aime, Director of Corporate Security at CVS Health in Hartford CT - Ex. 37

Prior to her current employment, Natalie Aime worked as an investigative analyst and protective operations specialist for the United States Secret Service in

Hartford, CT and Chappaqua, NY from 2002-2021. She has known Ms. Beaufils for almost twenty years on a personal level. She is aware of the charges, yet she continues to view Ms. Beaufils as a God-fearing, moral, humble, patient and virtuous person. She speaks of Ms. Beaufils' excellent mothering of her children and of her teaching them to love and honor God.

• **Esther Bordeau, CRT - Ex. 38**

Esther Bordeau is a certified respiratory therapist who has known Ms. Beaufils since 1998. Ms. Beaufils played a significant role in Ms. Bordeau's adolescent years, was the voice of reason, matron of honor when she married and Ms. Beaufils was always there for her. Ms. Beaufils helped Ms. Bordeau find professional resources through a difficult divorce and never gave up on her. Ms. Bordeau describes Ms. Beaufils as honest, reliable, kind-hearted, cheerful, upholds moral integrity and a praying woman.

• **Pascale Casimyr - Ex. 40**

Pascale Casimyr has known Ms. Beaufils from church since 2008. Ms. Casimyr speaks of Ms. Beaufils as a person of good character, patient, very respectful of others and genuinely nice. Ms. Beaufils helped and mentored women, listened patiently to their problems and prayed with them.

• **Maggie Charles - Ex. 41**

Maggie Charles works as an early childhood director for Bright Horizons. Ms. Beaufils is her biological sister and friend. They are four years apart. Ms. Charles says Ms. Beaufils "leads by example, growing up [Ms. Beaufils] took care of younger siblings, made sure they ate, did homework, didn't cause trouble and she made sure they had a childhood."

• **Dr. Adely Charles, brother-in-law, Ex. 42**

Dr. Adely Charles is Director of Music Division for the Salvation Army in the State of Florida. He has known the Beaufils since 2008, introduced by his wife, Maggie Charles. He says Ms. Beaufils is "the most giving, unselfish, loving human being, always ready to assist others in need. She has worked tirelessly and with integrity to be an outstanding professional and law-abiding citizen."

• **Tamara Charles - Ex. 43**

Tamara Charles is a board certified adult gerontology nurse practitioner in New York. She has known Ms. Beaufils for thirty years. Ms. Charles gives the example of when she was diagnosed with brain cancer six years ago. Ms. Beaufils heard about this and when Ms. Beaufils learned of Ms. Charles' illness "[Ms. Beaufils] packed her bags left her family and flew to New York to be with me. One day my doorbell rang and there was [Ms. Beaufils] with her suitcase and a beautiful wig to shelter my already balding head. [Ms. Beaufils] did everything for me while she was there and there were nights she just crawled into my bed just as we did when we were kids and prayed with me. This is who [Ms. Beaufils] is Your Honor."

• **Debra Tullos Cooper, MD - Ex. 44**

Dr. Cooper is an emergency medicine physician who worked in a supervisory role with Ms. Beaufils at Piedmont Newton Emergency Department since 2017. This is a three-page letter detailing Ms. Beaufils' professional skill, her abilities with patients, the respect she has earned as a professional from her colleagues.

• **Rachel Despinasse - Ex. 47**

Rachel Despinasse works as an education program director for a nonprofit

organization, Urban Hope Development. She has known Ms. Beaufils for fifteen years.

Ms. Beaufils served as a spiritual mentor to her. "In our conversations and interactions

with one another [Ms. Beaufils] has always helped me to walk in honesty and truth. She

carries herself in a way that shows me that she lives her life as such as well. I always

walk away from anytime we have together feeling as if a weight has been lifted and

truly encouraged."

- **Duvard Francois - Ex. 48**

Duvard Francois is Senior Pastor of Restoration Worship Center of the CMA

(Christian Missionary Alliance). He has known Ms. Beaufils for fourteen years. He

wrote that

> [Ms. Beaufils] is one of the most honest and sincere persons I ever met. Her
> integrity and her truthfulness are equivocally unquestionable. As a friend and
> her spiritual advisor, I can testify about that without any doubt. [Ms. Beaufils] is
> an exemplary servant of God whose character has never been questionable in our
> community until now. [Ms. Beaufils] is a wonderful, devoted, peaceful and
> lovely woman of God. She is a prayer warrior who is always on her knees for her
> family, her friends, and especially for all the Pastors in her community.

- **Nicole Francis Freckleton - Ex. 49**

Nicole Francis Freckleton is a nurse practitioner at Emergency Medicine

Piedmont Newton Hospital. She has known Ms. Beaufils for three years. She speaks of

Ms. Beaufils mourning the death of a 35-year-old son of strangers who died in the

hospital, of her being a mentor in their department to staff and doctors who would

come to her with their concerns. She wrote that

> [Ms. Beaufils] is one of the most honest individuals I have ever met. She was
> always truth forth coming, she never cut concerns[sic], never lie, she never called
> out from work. She was very proactive and assertive. The petitioner is not a rule
> breaker and has never been reprimanded during her entire career in the
> emergency room during our tenure . . . .[She] is an avid child of God and she

18

along with her family attend church regularly . . . .

- **Alusma Francois, Haitian Ministry Theophile Church in Christ, Inc. - Ex. 51**

Alusma Francois wrote the letter and she has known Ms. Beaufils since 2008.

Sister Beaufils has worked fervently in several areas of the Atlanta church, where she participates in the Praise team, Couple's ministry's coordinator, an active member of the women's group, and a mentor to younger married and single women, just to name a few. In addition, she devotedly supported her husband's ministry while he served as the President of this prestigious organization for nine years.

- **The Honorable Dudley Hollingsworth Bowen, Jr. - Ex. 53 (this letter is signed by an additional 72 individuals who support Sherley)**

The Honorable Dudley Hollingsworth Bowen, Jr. has known Ms. Beaufils since

2008. He wrote that

Your Honor, I am aware of the charges and conviction that the Court system has against [Ms. Beaufils]. Convinced of her innocence of these charges and knowing her candid and truthful character, our Leadership Team, along with our church members are willing and ready to come testify on her behalf if the Court requires us to do so. During the last 14 years, [Ms. Beaufils] has always demonstrated high moral, ethical, and noble qualities as a highly respected member of our church. She has served and remains a committed, loyal leader in our Women's Group, Young Adult Ministry and our Praise Team. She has been a Sunday School teacher and a mentor to our High Schoolers as well. Furthermore, she is the faithful, devoted wife of the former President of the HMTCC organization.

- **Doreen Jones, CEO and owner of Sugar Rush, LLC - Ex. 66**

Doreen Jones is neighbor of the Beaufils in the same subdivision in Conyers, GA.

Ms. Beaufils

is an upstanding member in the neighborhood and often served as Secretary of our Channing Cove Home-Owner Association . . . . I have known Mrs. Beaufils to be a kind and generous individual who is always willing to give of herself to improve the lives of others. Her honest traits reflect on her personality in dealing with others. Mrs. Beaufils and her family are very religious, she believes that God put her on this earth to serve others hence her profession in the medical field. She is a devoted and loving mother to her daughters and is always teaching them the importance of caring for others.

- **Joseph Krieger, registered nurse at Piedmont Newton Emergency Department - Ex. 67**

Joseph Krieger has known Ms. Beaufils since 2017. He wrote that

> The people in our department are aware of the charges that have been brought up against her and not a single person believes she would do something so horrendous. It violates everything we know of her character and what we see of her medical practice. For example, if a patient needs a particular resource that we can't provide and finances are an issue, I've seen her make a phone call and after phone call investigating and inquiring where the patient can get the help they need and ideally with the lowest financial burden. This can often take several frustrating hours but for [Ms. Beaufils], I don't think she is content unless she knows she has done her best for the patient. She will even call and follow up with the patients to make sure they got the help they needed when she has no obligation to do so. . . .[Ms. Beaufils] is an hourly worker in our department and therefore has no financial motive to help other patients outside of her assigned duties/role. Yet she readily and routinely volunteers to extend her help to other patients, nurses and providers.

- **Gilda Jean-Louis - Ex. 68**

Gilda Jean-Louis is co-founder and CEO of the Elise Joseph Foundation (EJF) which provides educational, health and humanitarian assistance to Haitian families in the Haitian communities of Philadelphia and Haiti. She has known Ms. Beaufils for eighteen years. She wrote that

> [d]uring [Ms. Beaufils'] undergraduate studies at Eastern (a Christian) University, where I worked for 22 years until recently, I was privileged to observe her work ethic as she studied very hard to meet the requirements to earn her degree in the Sciences in preparation for her career as a Nurse Practitioner. She is a woman of great faith, high ethical values, and possess [sic] a spirit of excellence…. She has always been honest, responsible, compassionate, discipline [sic] and dependable individual. I believe a grave mistake has been made at her expense.

- **Kathy Hatmaker, RN BSN - Ex. 69**

Kathy Hatmaker worked with Ms. Beaufils since 2016 at the Emergency Department at Piedmont Newton Hospital. Ms. Hartmaker worked as shift flow

coordinator and charge nurse. Ms. Beaufils worked as an advanced practice

professional. She wrote that

> [Ms. Beaufils] was widely known to be a thoughtful, compassionate and diligent provider, who always acted in the best interests of her patients . . . . My hope is that the Court will recognize her compassion, honesty, and commitment to excellence, and where honest mistakes were made, her sincere contrition. Concern for the inequities of the attribution of blame and liability in her case should be considered.

- **Maria Iler - Ex. 70**

Maria Iler is a nurse practitioner who worked closely with Ms. Beaufils for the

last five years at Piedmont Newton's Emergency Department. She wrote that

> I know that [Ms. Beaufils] would never intentionally do harm to anyone. She is one of the most professional, honest and caring people that I have ever known. [Ms. Beaufils] puts everyone's needs above her own. Her work ethic is as high as it gets. She is passionate about helping others with no expectation of anything in return. [Ms. Beaufils] is a God-fearing woman who exudes God's love to anyone who comes in contact with her.

- **Joanne Laventure - Ex. 71**

Joanne Laventure is a registered nurse and has known Ms. Beaufils for over

twenty years and they have worked as colleagues in their nursing careers. She wrote

that

> [o]ver the years, [Ms. Beaufils] have been a mentor, a confidant, and an amazing leader to me. She is a woman with qualities of being responsible, dependable, honest, and courteous. I can remember numerous times when she would put herself needs aside to cater and care for those in need around her. She is a prime example of what I look up to in a woman of integrity and strong moral character.

- **Ashley Leon - Ex. 72**

Ashley Leon is Ms. Beaufils' youngest sister, and they are nine years apart. Ms.

Beaufils played a strong role raising her and growing up she called Ms. Beaufils

mommy. She wrote that

> [Ms. Beaufils] raised me to have integrity and always put God first no matter what I do . . . . [Ms. Beaufils] has always displayed a strong moral character throughout my life. She encourages me and everyone around her to do better and be better. She has always been upright in our sisterhood and as a leader in her community and church. She focused on her education for years to help others and make a difference. She has made it a point to instill the importance of having morals, value, education and integrity.

• **Dr. Paul Patel - Ex. 73**

Dr. Paul Patel has been an emergency room physician for the past ten years and

has known Ms. Beaufils for five years. He wrote that

> [Ms. Beaufils] is extremely reliable, kind and soft spoken. She lives with certain ethical and moral values that make her stand out. She is thorough, hard working and a very kind hearted human being. I am aware of the charges against her and can validate that she would never intentionally do anything illegal, negligent or fraudulent. She has a strong religious faith and she lives by these principles.

• **Dr. Elna Poulard - Ex. 74**

Dr. Elna Poulard is President of non-profit organization, Family Support Circle,

Inc. She has known Ms. Beaufils personally and professionally for more than 19 years.

She wrote that

> I have never seen or met anyone as dedicated, respectful of others, and respectful to the law as [Ms. Beaufils]. [Ms. Beaufils] and her husband stand on the truth no matter what the cost is or will be. She stands on the shoulders of truth and honesty . . . . In 2012 we needed to provide pro bono nursing services to people who couldn't afford to pay for the service. Ms. Beaufils volunteered to provide nursing care for two people twice a week for nine months with no cost to the agency or the clients. Ms. Beaufils would have received $50.00 per hour per person compensation for the nine months service delivery. Instead, she donated her time and skills to ensure these two people received the care they needed and the organization obtained the home care license . . . . This is who [Ms. Beaufils] is and that is what she is about, helping others.

• **Reverend Sem Pierre, Reverend Sem Pierre Christian Fellowship Center of Philadelphia - Ex. 76**

Reverend Sem Pierre has known Ms. Beaufils for twenty years. Ms. Beaufils

became a member of the church in 2000. She tutored his daughter in advanced

placement biology and she was able to pass the class. He acknowledged the severity of

the charges, saying

> Over the 20 years that I have known [Ms. Beaufils], she has always remained
> consistent in being reliable and trustworthy. She would offer prayers and words
> of encouragement throughout my Praise and Worship ministry even up to the
> transition of my now Pastoral ministry. [Ms. Beaufils] has been honest in her
> approach of wanting to better the Haitian community with her experience in the
> medical field and bring awareness and recommended resources to ailments that
> plague the Black community.

- **Lisa Price - Ex. 78**

Lisa Price is an advanced practice provider at Piedmont Newton Hospital where

Ms. Beaufils worked as a full-time nurse practitioner. She has known Ms. Beaufils since

2017. Ms. Price is responsible for the scheduling and is in charge of the nurse

practitioners and physician's assistants. She wrote that

> Sherley Beaufils played an integral part in helping myself and the department
> complete these tasks. She always had the best attitude no matter what was going
> on around her. She loves what she does and has a passion for helping people. It
> was such a pleasure to be her lead. Her integrity was impeccable. I always knew
> that when she was working a shift, I did not have to be concerned with how the
> day was going because she always followed the processes and gave 100% to
> everything that she did. She took pride in her work and wanted to make sure
> that she left every patient that she encountered with something positive and
> uplifting.

- **Rev. Laumsomme Satine, Senior Pastor, Tabernacle Haitien de Philadelphie -
  Ex. 79**

Rev. Laumsomme Satine, who has known Ms. Beaufils for more than 20 years,

submits the following:

> [Ms. Beaufils] is one of the most dedicated, hardworking, and trustworthy
> persons that I have had the pleasure of working with in many capacities. She's

kind and compassionate and never miss an opportunity to help others. In November of 2003, I had the honor to officiate [Ms. Beaufils'] wedding to Dr. J.B. Beaufils and God has blessed then with three beautiful daughters. For over seven years, [Ms. Beaufils] and her husband have oversaw the financial department of the church and did their duties with excellence.

- **Tameka Walker-Blake, MD, Emergency Department Medical Director of Envision Physician Services at Piedmont Newton Hospital in Covington, GA - Ex. 80**

Tameka Walker-Blake has known Ms. Beaufils since 2017 and served as her

medical director during that time. She submits that

> [Ms. Beaufils] served as a hardworking nurse practitioner, going above and beyond to care for her patients. She always provided compassionate care and showed the most regard for the patient as a whole, even attending to their families in need. I personally have observed that compassion and received feedback from multiple team members about her quality service and care including other physicians, nurses, techs and clerks. She displayed honesty and integrity in her practice to the utmost degree.

- **Aquilas Zephir, CEO of Zephir Insurance and Financial Services, and Executive Pastor over the English ministry at the Haitian Ministry Theophile Church of Christ in Atlanta, GA - Ex. 81**

Aquilas Zephir has known Ms. Beaufils for the last nine years, working closely

with her in the Atlanta community through the church, training young men, women

and children in Christ-like character, attitude and behavior. He wrote that

> I humbly present my words of experience regarding her character and integrity. As you might imagine, to operate in a capacity that touches the lives of our next generation, one of the quality components needed is integrity. Not only has Mrs. Sherley Beaufils displayed high levels of integrity and trust, but she continues to be a highly sought-after mentor, speaker and leader within our community. Over the last nine years, she has continued to display the same character and integrity that has won her the trust and support of all the leadership, her peers and ministry partners.

- **Wilnia Aristilde, Ed. D GSHAC Family Foundation Chair, Lawrenceville, GA. - Ex. 81-A**

Dr. Aristilde has known Ms. Beaufils for five years through church ministries and by becoming friends. She wrote that

> [Ms. Beaufils] shares her love for the Lord by giving back to the community. During our couples retreat in 2019, [Ms. Beaufils] served as one of our speakers, pouring into women on how to maintain their marriages. [Ms. Beaufils] possesses the ability too reach different generations. She exemplified this by serving as out keynote speaker at our annual graduation ceremony in 2021.

### 2) Documents for Information Probation Stated Unable to Verify

Ms. Beaufils's verification of employment for 2020 and 2021 are attached (Ex. 24, 27)

Ms. Beaufils's IRS Form W-2s for 2020 and 2021 are attached, and verify her employment for those years. (Ex. 24, 27.) She has provided her degree transcripts to the probation officer.

Also attached is verification of Ms. Beaufils's business's being enrolled in the Medicare program, and having received a NPI. (Ex. 31.)

Ms. Beaufils was accused of billing Medicare for personal gain but she never billed Medicare for those services.  The NPI that was supposed to be used for services rendered by Ms. Beaufils was supposed to be her business NPI.  She did not know that RPN was not providing physician oversight for their patients, no correspondence came to her about patients except when Cigna called and she confronted them which they have denied.

For each visit Medicare would have paid Ms. Beaufils as the Nurse Practitioner 80% of the reimbursement.  At the lower end each would have been at least $100 and Medicare would have reimbursed her $80.00. It makes no sense for her to choose to get paid $25.00 by RPN instead of billing for her own services and getting paid $80.00; it

was part of the conspiracy that RPN never wanted Ms. Beaufils to know what they were doing. Her business has been Medicare approved since 2016/2017 and she states she has never billed Medicare. Also, she has not had any integrity issues with the Georgia Department of Banking and Finance as Mortgage Loan officer since 2012, or related nursing since 2006.

### d. Disparity in Sentencing & Objection to Suggested Sentence

Ms. Beaufils should not be ordered to serve a sentence of imprisonment because it would result in a tremendous disparity in sentence, in contrast to those who developed the scheme, who hired the physicians, who collected and sold "leads" and who sold DME. The developers of the scheme and the physicians who pled guilty to knowingly carrying out the scheme served no more than 6 months of prison time.

Jonathan Tanner received 6 months prison time, three years of supervised release, $2,000,000.00 restitution, $100.00 special assessment, pled to 18 U.S.C. 371 conspiracy by information encompassing a time period from January 2017 until April 2019. Tanner sought to sell leads to durable medical equipment companies or pharmacies within numerous districts across the country including among others Georgia, Florida, New Jersey, California, billing these items to Medicare and other federal health program beneficiaries. Tanner selected physicians to write orders for braces and other items so those items could be billed to Medicare and other federal health programs.

Jawad Salim was a licensed physician who signed orders prescribing medical devices and digitally signed medical records, certified that he performed examinations and conducted tests never conducted. Salim pled to an 18 U.S.C. § 371 conspiracy and

was sentenced to time served (one day) followed by one-year supervised release. $500,000 restitution, $100.00 special assessment.

Charlene Frame - Owned and operated companies in Georgia and elsewhere which were part of a nationwide telemedicine network. She obtained identities and insurance information of Medicare and other elderly patients through a series of call centers. For her role in this scheme, Ms. Frame, together with others, identified physicians to write orders for braces and other items so that the items could be billed to Medicare and other federal health program programs, in exchange for a payment to these physicians. As a further part of her role, Ms. Frame, together with others, facilitated the payment from others to the physicians. Ms. Frame pled guilty to conspiracy to engage in interstate travel or transportation in aid of a racketeering business and was sentenced to 1 day time served and three years' supervised release. $1,242,000.00 restitution, $100.00 special assessment.

Milagros Rivera - A licensed physician who signed orders prescribing medical devices and digitally signed medical records, certified that he performed examinations and conducted tests never conducted. She was sentenced to time served, 1 day, $100.00 special assessment, $5,500.00 fine, $81,360.00 Restitution, plea to an 18 U.S.C. § 371 conspiracy.

Anthony T. Securo - 5 years' probation, $100 special assessment, restitution $449,070.00, pled to false statements relating to health care matters. He stated that he examined a patient and determined that a DME order was medically necessary when he had no more than a short telephone conversation with the patient and had never met the patient.

Dino Soriano - A nurse practitioner, who signed orders prescribing medical devices and digitally signed medical records, certified that he performed examinations and conducted tests never conducted. He served 1 day in jail, supervised release 3 years, $100.00 special assessment, $170,000.00 restitution, pled to an 18 U.S.C. § 371 1 conspiracy.

Richard Steinkohl - Steinkohl, with others, owned and operated companies located in California and Florida and regularly conducted business from the State of Florida, including Emerald Medical Supply, together with other co-conspirators. Steinkohl, together with individuals known and unknown to him, sought to sell "leads" to durable medical equipment companies or pharmacies, located within numerous districts across the country, including, among others, the Georgia, Florida, New Jersey, and California, so that the items could be eventually billed to Medicare and other federal health program beneficiaries. He received a sentence of 6 months prison, 3 years supervised release, $100.00 special assessment. Pled to an 18 U.S.C. § 371 conspiracy.

Vishwas Kadam - Licensed physician who wrote prescriptions for braces and other items for telemedicine patients. He received 12 months' probation, $100 special assessment, $135,000 restitution. Pled to an 18 U.S.C. § 371 conspiracy.

Roland Greene - A licensed physician who write ordered for braces and other items for telemedicine for a small fee. He received 5 years' probation, special assessment $100, restitution $170,000.00. Pled to an 18 U.S.C. § 371 conspiracy.

Mark Gibbons - A licensed physician who signed orders prescribing medical devices and digitally signed medical records, certified that he performed examinations and conducted tests never conducted. He received 5 years' probation, special

assessment $100.00, restitution $24,480.00, pled to an 18 U.S.C. § 371 conspiracy.

Leo Frangipane - a physician who was paid to write orders for braces and other items for telemedicine patients. He signed false medical records describing consultations and tests never performed. He was sentenced to serve 1 day in prison, 2 years supervised release, $100.00 special assessment, $225,000.00 restitution.

Tiffani Forbes - A licensed physician, she wrote orders for braces and other items for telemedicine, she signed orders for orthotics and other items, she signed false medical records describing consultations and certified tests never done were performed. Forbes received 3 years of probation, $10,000.00 fine, restitution $136,493, pled to an 18 U.S.C. § 371 conspiracy.

Tina Folden - A nurse practitioner licensed in Georgia, she wrote orders for braces and other items for telemedicine, she signed orders for orthotics and other items, she signed false medical records describing consultations and certified tests never done were performed.  Folden received 3 years of probation, $100.00 special assessment, $22,536.00 restitution, pled to an 18 U.S.C. § 371 conspiracy.

Karen Butler - A licensed physician, she wrote orders for braces and other items for telemedicine, she signed orders for orthotics and other items, she signed false medical records describing consultations and certified tests never done were performed. 1 year probation, $100.00 special assessment, $459,362.00 restitution, pled to an 18 U.S.C. § 371 conspiracy.

Cathy Bagley - A licensed physician in Georgia, Connecticut, Minnesota, Montana, North Carolina, South Carolina and Wyoming, she wrote orders for braces and other items for telemedicine, she signed orders for orthotics and other items, she

signed false medical records describing consultations and certified tests never done were performed. 12 months of probation, $100.00 special assessment, $244,661.88 restitution, pled to an 18 U.S.C. § 371 conspiracy.

Angela Coleman - A licensed physician, she wrote orders for braces and other items for telemedicine, she signed orders for orthotics and other items, she signed false medical records describing consultations and certified tests never done were performed. Coleman received 3 years of probation, $100.00 special assessment, $41,500.00 restitution, pled to an 18 U.S.C. § 371 conspiracy.

Not one person served more than 6 months in prison.

### e. the Court should consider both the disparity between the sentences recommended for or received by co-defendants

The Government has provided this Court with the plea agreements and judgments of Ms. Beaufils's alleged co-conspirators already.

### f. the advisory guidelines establish a sentence that is greater than necessary

"Courts have long recognized that where the sentence called for by the guidelines would result in punishment greater than necessary, the court can depart downward." *United States v. Redemann*, 295 F. Supp.2d 887 (E.D. Wisc. 2003). Recently, courts throughout this country have issued opinions giving back to the sentencing judges the judicial discretion that, largely, was taken away with the enactment of the Federal Sentencing Guidelines. *See, United States v. Booker*, 125 S.Ct. 738, 543 U.S. 220 (2005), its predecessors such as *United States v. Ameline*, 400 F.3d 646, reh'g en banc granted, 401 F.3d 1007, 409 F.3d 1073 (9th Cir. 2005) and *Blakely v. Washington*, 124 S. Ct. 2531, 542 U.S. 296 (2004) and its successors such as *United States v. Fernandez*, 443 F.3d 19

(2d Cir. 2006)(government motion for downward departure is no longer an absolute prerequisite to a district court's imposition of sentence below the guideline range… .). See, *United States v. Flores*, 2006 WL 891003 (11th Cir., March 27, 2006) and *United States v. Baker*, 445 F.3d 987 (7th Cir. 2006). In the *Booke*r case, *supra*, the Supreme Court held that the sentencing guidelines are not mandatory but are only advisory. The courts must consider other factors set forth in 18 U.S.C. § 3553 when fashioning the appropriate sentence. *See*, *United States v. Fernandez*, *supra*, and *United States v. Ameline*, *supra* at 655, where the Court commented that the advisory guideline range is "only one of many factors that a sentencing judge must consider in determining an appropriate individualized sentence." *Ameline* also determined that the factors that should be considered should include the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for law and to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner, the need to avoid unwarranted sentencing disparities, and to provide restitution to the victims. *See also*, *United States v. Booker*, *supra* at 19.

Now, with the guidelines having become "advisory only," the Court should place no limitation on the information concerning the background, character, and conduct of a person convicted of an offense, and further, the district court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes of sentencing." *United States v. Booker*, supra at 15. Sentencing judges should bring "compassion and

common sense to the sentencing process.... [and] district courts should not hesitate to use their discretion in devising sentences that provide individualized justice." *United States v. Williams*, 65 F.3d 301, 309-310 (2d Cir. 1995).

In the instant case, undersigned counsel suggests that even though the advisory guideline computed by the Probation Office is accurate, the result is a guideline that is greater than necessary, and the purpose of sentencing should be satisfied by a sentence below the suggested guidelines. In the case of *United States v. Jones*, 352 F. Supp.2d 22, 26 (D.Me. 2005), the court imposed a sentence with a substantial downward departure because it believed that, based on the facts of that case, a lower sentence better would guarantee continuing correctional rehabilitation, in the most effective manner and "the marginal protection to the public afforded by a few more months in prison is more than offset by the increased risk upon this defendant's later release after the interruption of his treatment and other regimens."

## VI.    Conclusion

Reading the letters from colleagues, friends and spiritual guides make one grateful for the life of Ms. Sherley Beaufils. It makes one wish that one's life had been lived as hers has, and that people could say the things about us as they have said about her. She cannot be defined by this case and we urge this Court to exercise all of its authority to temper justice with mercy in imposing sentence.

Date:        August 3, 2022

Respectfully submitted,

**_s/ Joshua Sabert Lowther, Esq._**
Joshua Sabert Lowther, Esq.
Ga. Bar # 460398
jlowther@lowtherwalker.com

**_s/ Katryna Lyn Spearman, Esq._**
Katryna Lyn Spearman, Esq.
Ga. Bar # 616038
kspearman@lowtherwalker.com

Lowther | Walker LLC
101 Marietta St., NW, Ste. 3325
Atlanta, GA 30303
404.496.4052
www.lowtherwalker.com

Attorneys for Defendant
Sherley Leon Beaufils

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION**

UNITED STATES OF AMERICA )
)           1:20-CR-00063-BKE-DHB-1
v.                                                  )
)
SHERLEY L. BEAUFILS                  )

**CERTIFICATE OF SERVICE**

I certify that on August 3, 2022, I electronically filed the foregoing SENTENCING

MEMORANDUM with the Clerk of the United States District Court for the Southern

District of Georgia by way of the CM/ECF system, which automatically will serve this

document on the attorneys of record for the parties in this case by electronic mail.

Date:           August 8, 2022

Respectfully submitted,

**_s/ Joshua Sabert Lowther, Esq._**
Joshua Sabert Lowther, Esq.
Ga. Bar # 460398
jlowther@lowtherwalker.com

Lowther | Walker LLC
101 Marietta St., NW, Ste. 3325
Atlanta, GA 30303
404.496.4052
www.lowtherwalker.com